IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFRY PIKUS, | ) | |
| | ) | CASE NO. 1:03CV621 |
| Plaintiff, | ) | |
| | ) | JUDGE WELLS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE HEMANN |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | Docket #61 |
| | ) | |

This case is before the magistrate judge on referral. Pending is the motion of Metropolitan Life Insurance Company ("Metropolitan") for summary judgment ("Def. mot."; Docket #61). Plaintiff, Jeffry Pikus ("Pikus"), opposes the motion ("Pl. opp."; Docket #68). For the reasons stated below, the magistrate judge recommends that the court grant Metropolitan's motion in its entirety.

I.

Pikus is a resident of Ohio. Metropolitan is incorporated in New York, and its principal place of business is in New York. The amount in controversy exceeds $75,000. The court has jurisdiction over this action.

The court views the facts, as it must, in the light most favorable to the opposing party. Except where otherwise noted Pikus alleges or does not deny the following facts.

Pikus began working for Metropolitan in 1975 as a sales agent. Pikus left Metropolitan

in 1986 then in 1989 returned to work for Metropolitan in its Columbus, Ohio offices as an

Agency Director.  In about 1991 Metropolitan promoted Pikus to Regional Training Specialist,

a position which included responsibilities for training sales representatives.  Metropolitan

promoted Pikus again in 1994 to Training Director and again in about 1996 to manager of the

Cleveland, Ohio agency ("Pikus' agency").

Beginning about 1995 Metropolitan began consolidating offices in northeastern Ohio

as a cost cutting measure.  According to Pikus,

> [d]uring this process, the Company would eliminate some managers and
> administrative personnel within the merged office and then merge the remaining
> managers and agents into another office.  This process would eliminate the cost of the
> office lease and administrative salaries.  As the Company's various offices in the
> northeast Ohio region were eliminated, I was the manager who ALWAYS absorbed the
> other agencies, because my agency was the most successful one in the Greater
> Cleveland area. . . . This consolidation process consumed much time and effort on my
> part, and I was the Managing Director who successfully accomplished consolidating
> the Company's many small offices in this geographic region into just three offices . .
> . As I acquired manages [sic] and agents through the Company's consolidation
> process, I was instructed to, and did, weed out and eliminate poor performers.

Affidavit of Pikus ("Pikus aff."), Pl. opp., Exh. 1., p. 2.  Pikus contends that his sales forces

declined after mergers because some agents voluntarily quit after being merged into more

distant offices and because he eliminated poor performers.

Metropolitan reorganized the agencies in its major metropolitan markets in 2000.

Pikus' agency doubled in size and included responsibility for all sales agents in northeastern

Ohio.  Metropolitan claims that the Managing Director position which Pikus occupied after the

reorganization changed the nature of Pikus' job.  Previously, according to Metropolitan, a

Managing Director was a front-line supervisor who was directly involved in supervising agents.

After the reorganization the Managing Director had a greater number of subordinate

2

administrative personnel.  This required the Managing Director to act less like a front-line supervisor and more like the CEO of a small business, managing sales agents through administrators who assumed responsibility for specialized management functions rather than managing sales representatives directly.

Metropolitan instructed Pikus to continue to weed out poor performers among his personnel, and he did so.  Metropolitan also instructed Pikus to hire new sales personnel sufficient to replace those whom he had eliminated and still expand the sales force.  Pikus conducted recruiting efforts to replace personnel lost through mergers and for other reasons. He won an award for his efforts to recruit new agents during a four-month period in late 2001. Metropolitan notes, however, that Pikus' hires for this period were 300% higher than his results for the 22 months before and after the contest period.[1]  Despite his recruiting efforts, the size of Pikus' sales force declined from 78 agents to 59.  Likewise, total production at Pikus' agency measured by first year commissions declined in 2000 and again in 2001.  *See* Affidavit of Mike Garzanelli ("Garzanelli aff. 1"), Def. mot., pp. 1-2.[2]

Metropolitan alleges that by January 2001 it became aware that many Managing Directors who had been successful before Metropolitan's reorganization were having difficulties.  Metropolitan conducted a nationwide evaluation of its Managing Directors, known

_____

[1]  Pikus concedes that the results for a full year are important and concedes that the first part of that year "wasn't what we wanted it to be."  Deposition of Pikus ("Pikus depo."; Docket #74), p. 303; s*ee also* Pikus depo. p. 67.

[2]  The page numbers here and in first citations to all affidavits produced by defendants refer to the pages of the cited affidavit.  Defendants did not label their affidavit exhibits with letters or numbers.

3

as the "Talent Gap analysis," rating their performance with an A, B, or C.  After the Talent Gap analysis, Metropolitan began replacing most Managing Directors who had received a C in the analysis.[3]   Metropolitan replaced 37 Managing Directors due to a poor evaluation. Metropolitan asserts, and Pikus does not contest, that some of the Managing Directors replaced were significantly younger than Pikus[4] and that some of the individuals hired to replace demoted Managing Directors were approximately Pikus' age or older.[5]

According to Pikus, he was successful as Managing Director.  According to Metropolitan, Pikus had been successful before the reorganization but had problems adjusting to the reorganized position of Managing Director.  Pikus received a C in his 2001 evaluation, and his superior, Brian Breneman ("Breneman"), told him in January 2002 that he would be demoted.

Pikus alleges that on April 24, 2002 he learned that Metropolitan was looking for someone to fill the position of Life Wholesaler.  Pikus met with Breneman about the position on April 29, 2002.  Pikus claims that at that meeting Breneman asked him how old he was.

---

[3]  There were three Managing Directors who received a "C" who were not replaced. One of these individuals was 33 years old, one was 47 years old, and one was 54 years old.

[4]  Metropolitan cites one replaced Managing Director who was 31 years old, three who were 34 years old, three who were 37 years old, one who was 39 years old, one who was 40 years old, and one who was 43 years old.   *See* Affidavit of Naomi Neiman ("Neiman aff."), Def. mot., pp. 3-4.

[5]  Metropolitan cites one replacement who was 47 years old, two replacements who were 48 years old, five replacements who were more than 50 years old, and one replacement who was over 60 years old. *See* Neiman aff. at 1-2.

In countering this evidence that age played no role in Metropolitan's decision to replace certain Managing Directors, Pikus responds that he was the only Managing Director who was "pension heavy" at the time of his promotion and close to obtaining a company pension.  Pl. opp. at 22.  Pikus cites no evidence to support this assertion.

Breneman denies this. Breneman claims that Pikus said that he wanted to apply for a job which would allow him to focus on training and forego the other responsibilities of a Managing Director. Pikus denies this.

In May 2002 Pikus told Dan Mule ("Mule"), the director of wholesalers, that he was interested in the open Life Wholesaler position. Pikus alleges that at a June 26, 2002 agency meeting Breneman indicated that Pikus would be assuming the Life Wholesaler position. On July 18, 2002, however, Mule told Pikus that he would not be moved to the Life Wholesaler position, and Breneman later confirmed this.

Metropolitan removed Pikus as Managing Director on September 1, 2002 and promoted Peter Butler ("Butler") to that position. Butler was younger than 40 years old when he was promoted, and Pikus alleges that Butler was less qualified than he. Metropolitan demoted Pikus to the position of sales representative. According to Pikus, when Metropolitan demoted him he was told that this was part of Metropolitan's effort to bring a "new culture" to Metropolitan and get rid of "traditional thinking."

Pikus met Butler briefly when Butler was introduced as the new Managing Director of the Northeast Ohio Agency. At that time Pikus told Butler that he wanted to get together with Butler to discuss his situation with Metropolitan. Pikus claims that Butler agreed to this but that Butler never responded to Pikus' attempts to meet again with Butler. Pikus also asserts that although Butler arranged meetings with all other sales representatives in the agency in September 2002, Butler did not arrange a meeting with Pikus.

According to Pikus the following events occurred immediately before and after he was removed from the Managing Director position:

5

On or about August 7, 2003, Breneman set up a meeting at Plaintiff's former office where he performed the tasks of Managing Director.  At the conclusion of that meeting, Breneman stated that he wanted Plaintiff to vacate his current office location by Monday, September 2, 2002, and move to the vacant office down the hall.  Plaintiff complied and moved out on Saturday August 31, 2002.  On September 12, 2002, after moving into his new office, Plaintiff received a voice mail from Josh Cantwell (Functional Manager) requesting Plaintiff to change offices with him because it was closer to where Cantwell's secretary was located.  Plaintiff responded that it was fine with Plaintiff because the offices were similar and it would benefit Cantwell without creating any real problem for Plaintiff.  Cantwell stated that he would move in on the weekend of September 14-15, 2002.  When Plaintiff arrived at the Office on September 16, 2002, Cantwell did not move in but was still considering that option.  Plaintiff's response was to let him know and he would be glad to relocate to Cantwell's office.

On or about September 19, 2002, Plaintiff had a telephone conversation with Kim Edson, of Defendant's Human Resources Department, and asked why he was removed from the position of Managing Director.  On Friday, September 27, 2002, Plaintiff arrived at the Office, but before going into his office, he was stopped by Administrative Quality Business Clerk Jody Wilson, who embarrassingly said to Plaintiff that this office location no longer belonged to Plaintiff, and that Mike Angala (who was in his first year with Defendant) was now working out of this location.  Plaintiff was stunned and greatly humiliated by these events, which occurred in front of the clerical staff he once managed.

Plaintiff then proceeded in a calm manner to meet with General Administrator June Sipos.  Plaintiff asked Sipos what had taken place and she confirmed that Angala had moved into Plaintiff's previous location, and that a location for Plaintiff had not been established.  Plaintiff then proceeded to work out of one of the client rooms for the day.  Plaintiff's next occasion to come to work was an agency scheduled marketing day on October 15, 2002.  Plaintiff arrived early for the meeting, and had the opportunity to speak to Butler.  After greeting Plaintiff, Butler's response was, "I thought you were on vacation" (which was actually the week prior).  Plaintiff then met with Sipos to inquire where his work location was in the Office.  Sipos' response was that there were some open seats, but none had been "assigned" to Plaintiff.  Due to the circumstances, Plaintiff left the Office to avoid any further embarrassment.

Plaintiff, however, continued to seek alternative comparable employment opportunities within Defendant but his efforts were always rejected by Defendant.  Plaintiff was constructively discharged by Defendant on or about February 7, 2003.  Plaintiff was never assigned a desk or a work area.  Butler even excluded Plaintiff from meetings of[6]

---

[6]  In the original the sentence ends here.

Pl. opp. at 5-7 (punctuation in the original) (citations to Complaint, Answer, and Pikus aff. omitted).  Pikus was 49 years old at the time of his alleged constructive discharge.

Pikus filed the instant action in state court on February 27, 2003.  Metropolitan removed the action to federal court on April 4, 2003.  Pikus' amended complaint alleges age discrimination in violation of state law, breach of an implied contract, and promissory estoppel.  Metropolitan denies Pikus' claims and moves for summary judgment.  Pikus opposes Metropolitan's motion for summary judgment as to his causes of action for age discrimination and breach of an implied contract.  He does not oppose Metropolitan's motion as to his cause of action based on promissory estoppel.

II.

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U. S. 317 (1986).  The substantive law of the case identifies which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue of material fact.  *Id.* at 323.  The nonmoving party must then show the existence of a material fact which must be tried.  *Id.* at 324.

When evaluating a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to . . . the party opposing the motion . . . ." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962); *Aetna Ins. Co. v. Loveland Gas &*

7

*Elec. Co.*, 369 F.2d 648 (6th Cir. 1966).  This includes taking the nonmoving party's uncontradicted allegations as true and giving the benefit of the doubt to the nonmoving party's assertions when they conflict with those of the movant.  *Bishop v. Wood*, 426 U.S. 341 (1976); *Bosely v. City of Euclid*, 496 F.2d 193, 197 (6th Cir. 1974).

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e).  *See Celotex,* 477 U.S. at 324.  The nonmoving party may oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves. . . ," *id.*, or by any other evidentiary material admissible at trial.  *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993); *see also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, 10A, § 2721 (1998).  Conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes.  *Lujan v. National Wildlife Fed'n*, 497 U.S. 871 888-89 (1990).  There must be enough evidence that a reasonable jury could find for the nonmoving party.  *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989).

### III.  Cause of action for age discrimination

Pikus asserts that Metropolitan violated Ohio's laws prohibiting age discrimination by demoting him and constructively discharging him on account of his age.  Metropolitan contends that it had legitimate business reasons for demoting Pikus and denies that any action it took with regard to Pikus was motivated by consideration of his age.

8

In *Peters v. Lincoln Elec.*, 285 F.3d 456, 469 (6th Cir. 2002), the Sixth Circuit found that claims of age discrimination brought pursuant to Ohio law are analyzed in the same way as claims of age discrimination brought pursuant to Title VII and the Age Discrimination in Employment Act ("ADEA").  *See also Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 265 (6th Cir.1986) (holding that claims brought pursuant to the ADEA are analyzed in the same way as claims brought pursuant to Title VII).  Under the ADEA a plaintiff can establish a case of age discrimination in two ways:  by establishing direct evidence of discrimination or by following the burden-shifting analysis of *McDonnell Douglas vs. Green*, 411 U.S. 792 (1973).  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 547-48 (6th Cir. 2004).

Direct evidence "proves the existence of a fact without requiring any inferences." *Rowan*, 360 F.3d at 548.  "[D]irect evidence is that evidence which, if believed, requires a conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Kocak v. Community Health Partners*, 400 F.3d 466, 470 (6th Cir. 2005) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir. 1999)).  "Once a plaintiff proffers direct evidence of discrimination, 'the burden of persuasion shifts to the defendant to show that it would have [taken the adverse action] had it not been motivated by discrimination.'"  *Kocak*, 400 F.3d at 470 (quoting *Jacklyn,* 176 F.3d at 926).

A plaintiff may also establish a prima facie case of discrimination in the absence of direct evidence using the evidentiary framework described in *McDonnell-Douglas*.  The prima facie case has four prongs, all of which must be supported with sufficient evidence to

9

allow a reasonable jury to find proof by a preponderance of the evidence: (1) that plaintiff was a member of a protected group, (2) that defendant subjected plaintiff to an adverse employment decision, (3) that plaintiff was qualified for the position, and (4) that plaintiff was replaced by or was treated less favorably than a person outside of the protected class or a significantly younger person.  *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002).  The question of whether an individual is qualified for a position must be considered without taking into consideration any legitimate non-discriminatory reason for the adverse employment decision that a defendant may proffer.  *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 661-62 (6th Cir. 2000); *see also Danielson v. City of Lorain,* 938 F.2d 681, 683 (6th Cir. 1991) (finding that poor work performance does not of itself bar the establishment of a prima facie case).  In determining whether an individual is qualified for a job, a court should focus on the plaintiff's objective qualifications for the job, not on the employer's assessment of the plaintiff's later performance.  *Wexler v. White's Fine Furniture,* 317 F.3d 564, 575-76 (6th Cir. 2003) (*en banc*).

If plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment decision.  *Grosjean*, 349 F.3d at 335.  If the defendant articulates such a reason, plaintiff has the burden of proving that the defendant's nondiscriminatory reason is mere pretext.  The plaintiff may accomplish this by showing any of the following: (1) that the proffered reason had no basis in fact;  (2) that the proffered reason did not actually motivate the decision; or (3) that

10

the reason is not sufficient to motivate the adverse decision.  *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 184 (6th Cir. 2004).  "[P]laintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation."  *Grosjean*, 349 F.3d at 335 (quoting *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1083 (6th Cir. 1994)).  Although the burden of going forward shifts from party to party, the ultimate burden of persuading the factfinder that the defendant intentionally discriminated against the plaintiff always remains with the plaintiff.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

*A.*    *Direct evidence of discrimination*

Pikus cites a quarterly review on April 29, 2001 with Breneman which Pikus claims constitutes direct evidence of age discrimination.  Pikus asserts that when he brought up the possibility that he might apply for a position as a Life Wholesaler, Breneman mentioned the possibility of a "bridge" to retirement if Pikus were a Life Wholesaler.  Pikus contends that a Life Wholesaler is part of Metropolitan's administrative payroll and that if his job were eliminated when he was between the ages of 50 and 55, he could receive a "bridge" to retirement and insurance benefits that he could not receive if he were a field representative and he lost his job.  According to Pikus, the conversation with Breneman went as follows:

> A.    I went in to meet with [Breneman] and various informalities, just talked, did a quick evaluation of performance and what we're going to do next quarter, and I said to Brian, I'd like to talk to you about a conversation from Dan Mule I heard him say at our Chicago meeting, and he goes what's that.  And I says they're talking about the life wholesaler position, you know, for what it's worth I would just like to look into it, I'd like to talk to you about it.  He was kind of surprised on his expressions, startled, got up, closed the door, and he says, well, what are you talking about?  And I went into some detail about it, and after a few sentences, he even said to me well, what's your age, how old are you? So I went to tell him I'm going to be 49.  Other conversation pursued, talked about

11

it.  He brought to my attention it's on the administrative payroll, that it's, he goes well, about bridging, it's a term I'd only heard from my clerical people.  I kind of wasn't too much interested in that as much as saying well I'm really looking at, you know, seeing if there's different contributions in different areas.  I don't know if I ever want to do this or not, but I'd love to – it just caught my ear, and I said out of courtesy to you, Brian, out of respect, I said I'll mention it to you.

Q.  What did he tell you about bridging or what did he say?

A.  It was just a conversation.  He said that well geez, that's on the administrative side because on the field payroll side you're not eligible for a bridge, and I said okay.

Q.  Okay.

A.  I didn't know enough to, I just kind of went along with it at that.

Q.  And it was sort of around the same time that he made the comment about how old you are?

A.  It was after.  He made the comment first about how old I was and then the bridging came up.

Q.  I'm asking was it sort of, but was it in the same general time in the conversation or was it like 30 minutes later?

A.  Oh, no.  Within five minutes.  It was a combination.  I remember the circumstances.

Q.  Okay.  What do you remember about the circumstances?

A.  Well, I mean, how he closed the door.

Q.  Okay.

A.  And finished by saying this is, let me work behind the scenes, whatever that meant.

Q.  And he said you wouldn't be eligible for a bridge if you were still on the field payroll?

A.  That's how I took it, yes.

Q.  But because --

A.  That was secondary.  I mean, I was looking to work until 56.  I didn't care.

Q.  Okay. But he was basically saying that because this job is administrative payroll, then maybe you'd be eligible for a bridge?

A.  Yes. He said that.  I didn't know the relevance of it at the time, but I started to feel a little bit uncomfortable about it because I was like what importance is that?

Pikus depo. at 121-23 (errors in the original).  Breneman denies asking Pikus his age.

Pikus claims that after this conversation Breneman then told him that he would contact

Mule to discuss Pikus' application for the job of Life Wholesaler and that a week later

Breneman told him to go ahead and apply for the job.  According to Pikus, Mule was positive

about Pikus' application during their first discussion but became less positive in a later conversation. Eventually, Mule decided to hire someone other than Pikus.

Assuming that Pikus' version of the April 29, 2001 conversation is correct, the alleged conversation is not direct evidence of discrimination. "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003). Moreover, "[w]hatever the strength of [the] evidence, it is not 'direct' evidence [if] it admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact." *Kocak*, 400 F.3d at 471 (quoting *Weigel v. Baptist Hosp. of East Tennessee,* 302 F.3d 367, 382 (6th Cir. 2002)).

Breneman's asking Pikus how old he was requires the factfinder to make the following inferences before finding age discrimination: Breneman decided to use the opportunity of the conversation about the Life Wholesaler to find out Pikus' age; Breneman was interested in Pikus' age because he did not believe that persons of a certain age could do Pikus' job; Breneman believed that 49 was an age at which Pikus had diminished competence to do his job; and Breneman subsequently discharged Pikus because of his age.[7] The finder of fact could also interpret Breneman's actions to mean that Breneman was upset because Pikus was leaving field work for administrative work solely because Pikus thought that this would

---

[7] While the alleged conversation might conceivably have provided a motive to discharge Pikus, it could not have provided a motive to demote him. Pikus had been informed of his demotion more than three months before the conversation occurred.

13

give him a bridge to retirement if his job were eliminated. Alternatively Breneman might have been inquiring about Pikus' age to see whether Pikus' idea made practical sense. The alleged conversation "is not direct evidence of discrimination because it does not compel a reasonable factfinder to conclude that" Pikus was discriminated against because of his age. *Kocak*, 400 F.3d at 471; *see also Laderach v. U-Haul of Northwestern Ohio,* 207 F.3d 825, 829 (6th Cir. 2000) (finding that defendant's alleged statement that defendant would not promote plaintiff because of her sex and did not want plaintiff to answer the telephone hotline because "women are not mechanically inclined" was direct evidence of sex discrimination).

For these reasons the magistrate judge recommends that the court find that Pikus does not offer direct evidence of discrimination.

B.    *Indirect evidence of discrimination*

Pikus also uses the *McDonnell-Douglas* framework to construct a case in support of his claims that he was discriminated against because of his age by being demoted and by being constructively discharged. The court will examine each of these claims separately.

1.    *Discrimination and demotion*

Pikus claims that his age was part of Metropolitan's motive in removing him as Managing Director and demoting him to representative. Metropolitan does not contest Pikus' arguments regarding the establishment of a prima facie case of discrimination. Rather, it offers legitimate, nondiscriminatory reasons for the demotion, including a drop in the number of representatives at Pikus' agency, a drop in production in the form of commissions, and Pikus' agency's failure of its compliance audit. All of these factors contributed to Pikus' being given a grade of "C" during the Talent Gap analysis of Metropolitan's Managing Directors.

14

This grade, according to Metropolitan, was the reason for Pikus' demotion. Pikus responds by arguing that these reasons are mere pretexts for discrimination. Each of these reasons will be examined in turn to determine whether they have merit or are mere pretext.

### a.    A drop in the number of representatives

Pikus does not deny that the number of representatives declined at his agency from 78 to 59 between the time of the merger and the time that he was informed of his demotion in 2002.[8]  Rather, he claims that Metropolitan caused this drop by requiring him to "weed out" poor performers among his agents and that Metropolitan sabotaged him because of his age.

Metropolitan asserts that after the merger it told all Managing Directors to eliminate poorly-performing representatives and hire sufficient new representatives to expand their sales staff. It offers evidence of the goals it set for Pikus in this regard:  in 2000 it instructed Pikus to eliminate 12 low producers and hire 20 new salespersons for a net gain of eight salespersons, and in 2001 it instructed Pikus to eliminate 16 low producers and hire 27 new salespersons for a net gain of 11 salespersons. *See* Def. Mot., Exh. 1; Defendant's Reply ("Reply"; attached to Docket #72), Exhs. III, JJJ.; Affidavit of Garzanelli ("Garzanelli aff. 2"), Reply, p. 6. Pikus does not deny that he failed to hire a sufficient number of new salespersons

_____

[8]  Defendant's motion for summary judgment includes a graph displaying a precipitous drop in Pikus' sales personnel between January 2000 and the middle of 2003 and an equally dramatic rise in personnel between the middle of 2003 and 2004.  Defendant achieves the precipitously falling and dramatically rising lines of the graph by using fifty as the baseline for the x axis of the graph rather than using zero as the baseline.  Had zero been used as the baseline for the x axis, the effect would have been substantially less impressive.  Defendants are reminded that there are no prizes for effective marketing in briefs to the court and seldom, if ever, are courts misled by such.

15

to replace those he terminated, much less expand his workforce.

Whether the recruiting goals Metropolitan set for Pikus were difficult or even impossible of fulfillment is not the point.  Nor is it relevant whether Pikus' replacement, Butler, succeeded where Pikus failed.  The only relevant issue is whether Pikus was treated differently because of his age.  Pikus does not show that the recruiting goals Metropolitan set for him differed significantly from the goals Metropolitan set for younger Managing Directors; nor does he show that in holding him accountable for his failure to meet those goals Metropolitan treated him differently than younger Managing Directors.  Pikus cannot successfully argue, therefore, that his failure to meet the recruiting goals that Metropolitan set for him and Metropolitan's treatment of him for that failure were the result of age discrimination.  For this reason Pikus' contention that Metropolitan sabotaged his recruitment efforts because of his age by requiring him to "weed out" poor performers is not well taken.

### b.    A drop in commissions

Pikus does not deny that overall production in the form of commissions originating in his agency dropped between the merger and the time that he was informed of his demotion.  Pikus claims, however, that although overall agency production declined, his production per representative was better than that of his replacement, Butler, in 2003 and 2004.  Pikus concludes from this, therefore, that Metropolitan's claim that he was demoted for poor performance was mere pretext for age discrimination.  Metropolitan responds that overall production is the key measure of an agency's success, not production per representative.  Metropolitan further responds that even if production per representative were the proper measure, Pikus errs in asserting that production per representative increased during the

16

relevant period. According to Metropolitan, Pikus overstates production per representative because his calculations of his production per representative are incorrect.

Assuming *arguendo* that production per representative is the proper measure of an agency's success, Pikus' argument is not well taken for two reasons. Pikus states, "One of the <u>key measures</u> of an agency's success is the <u>Production Per Agent</u> [PPA], and this . . . appears on the Run Rate as Schedule 2A." Pl. opp. at 8. Schedule 2A for the 2000 Run Rate gives Pikus' production per representative as $28,266, and Schedule 2A for the 2001 Run Rate gives Pikus' production per representative as $25,258. *See* Def. mot., Exh. 1, p. 12; Def. mot., Exh. 2, p. 12; *see also* Garzanelli aff. 1 at 1-2 and Garzanelli aff. 2 at 1-5 for a discussion of these documents. These are not the figures which Pikus cites to show that his production per agent was better than Butler's. Thus, Pikus' argument is factually incorrect. According to Metropolitan, Pikus' production per agent was not only worse than Butler's, but it declined from 2000 to 2001 and was significantly below Metropolitan's national average. Garzanelli aff. 2 at 2.

Second, Pikus' argument is not well taken because it is irrelevant. Whether Pikus' production per agent in 2000 and 2001 was better than Butler's in 2003 and 2004 has no bearing on whether the reasons given for demoting Pikus in January 2002 were pretextual. In determining whether an individual is qualified for a job, a court focuses on the plaintiff's objective qualifications for the job at the time of hiring, not on later performance. *Wexler*, 317 F.3d at 575-76. Whether Pikus or Butler actually performed better as Managing Director tells nothing about who was perceived to be more competent at the time of hiring.

Pikus admits that his gross production in the form of commissions originating in his

17

agency dropped between the merger and the time that he was informed of his demotion.

Metropolitan offers evidence to support its claim that Pikus' production per agent declined

from 2000 to 2001 and was significantly below the national average in both years.  For this

reason Pikus' argument that his production per agent demonstrates that Metropolitan's

reasons for firing him were mere pretext is not well taken.

<em>c.    Failure of the compliance audit</em>

Pikus does not deny that his agency failed its compliance audit.  Pikus offers the

following, however, by way of explanation:

> 55.    In 2001, the Company determined that [Pikus' agency] failed its 2001
> Corporate Ethics Compliance audit [CEC]. I objected to the rating by the Company.
> Pikus dep. 65.  The rating the Company gave [Pikus' agency] cost [it] between
> $75,000 and $100,000. Pikus dep. 66. There was a consensus among the Managing
> Directors that the Company had to have so many fails of the CEC audit per year.
> Pikus dep. 67.  In 2001, the Company sent a new tougher auditor to [Pikus' agency]
> to conduct the [its] CEC audit. Pikus dep. 68.
>
> 56.     I now believe that the Company caused [Pikus' agency] to fail its 2001 CEC
> audit to again bolster the Company's false claims regarding my performance, and that
> the true reason that the Company caused [Pikus' agency] to fail its 2001 CEC audit
> was motivated by age based discrimination.

Pl. opp. at 22 (quoting Pikus aff. at 11).  Pikus cites no evidence to support his speculations

that the auditor sent to audit his agency in 2001 was "tougher" or that the Company purposely

failed Pikus' agency's CEC audit because of Pikus' age.  His arguments, therefore, are not

well taken.

<em>d.    Summary</em>

Pikus reviews other reasons which Metropolitan gives for his demotion and claims that

18

these, too, are pretextual, but there is no need to review them here.[9]  Pikus admits that the two primary factors which supervisors look at in evaluating how an agency is doing are manpower and production in the form of commissions.  Pikus depo. at 33-34.  Pikus admits that the number of salespersons at Pikus' agency dropped from 78 to 59 between the time of the merger and the time that he was informed of his demotion in 2002 and offers no competent evidence to contradict Metropolitan's supported assertion that Pikus' commissions declined in 2000 and 2001 and were substantially below the national average.  Given this evidence and given Pikus' agency's failure of its 2001 CEC, no reasonable jury could find that Metropolitan's reasons for demoting Pikus were merely pretextual.  For this reason the magistrate judge recommends that the court grant Metropolitan's motion for summary judgment as regards Pikus' cause of action for age discrimination based on his demotion.

B.    *Constructive discharge*

Pikus also contends that he was discriminated against because of his age when he was constructively discharged.  A plaintiff alleging termination in violation of Ohio's laws against age discrimination may offer evidence that he or she was constructively discharged by referring to the defendant's conduct.  *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St. 3d 578, 578, 664 N.E.2d 1272, 1274 (1996).  "The test for determining whether an employee was constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign."  *Id.* (syllabus paragraph four).  Courts should be flexible in applying the test described

---

[9]  *See* Pl. opp. at 11-22.  *See also* Reply at 10-17 for Metropolitan's responses to these accusations.

19

in *Mauzy*:

> In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent.  They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the "discharge" label.  No single factor is determinative.  Instead, a myriad of factors are considered, including reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group.

*Mauzy*, 75 Ohio St. 3d at 589, 664 N.E.2d 1281.

Pikus makes a very brief argument regarding his claim of constructive discharge.  He contends that Metropolitan gave him an office after demoting him, then took that office away and gave it to a first-year associate.  He also claims that Metropolitan never assigned him an alternative work space, was excluded from company meetings, and was ignored by Butler.  This, Pikus contends, was sufficient to constructively discharge him from employment.

Metropolitan provides the following explanation of how Pikus lost his office.  Except where otherwise noted, Metropolitan supports its account with citations to Pikus depo., the deposition of Butler ("Butler depo") attached to Def. mot., and the affidavit of Breneman ("Breneman aff."), also attached to Def. mot.:

> The Cleveland agency has a "limited number"[10] of enclosed offices.  Most sales reps work in cubicles; only the top producers typically have a private office.  During the summer, before Butler arrived, plaintiff mentioned to Breneman that while he knew he would have to move out of the Managing Director's office, he wanted another private office somewhere in the Cleveland facility.  Breneman agreed to that request.
> Several months later, after Labor Day, Butler joined the agency.  Breneman, whose office is hundreds of miles away in Harrisburg, did not remember to tell Butler the plaintiff was supposed to have an office.  Likewise, plaintiff never told Butler about

---

[10]  These and the other unaccountable (and superfluous) quotation marks in this excerpt are to be found in the original.

the office agreement.

Plaintiff picked out his new office. Before he moved into it, though, an assistant manager asked him to "trade." He agreed, but then confusion set in. The other manager changed his mind, while plaintiff "assumed [the trade] was a done deal." Expecting to trade, plaintiff **cleared out** his office, taking all personal belongings **home**. Then he went on vacation for two weeks.

While plaintiff was on vacation, Butler met with one of the agency's top sales reps, Mike Angala. He asked Angala "why he was not coming into the office on a regular basis." Angala replied that he didn't have a private office, and he didn't like working out of a cubicle. Butler figured there was an easy solution to that problem:

> I walked down the hall, I looked at [this] office that was empty with nothing in it, not a [single] piece of paper [and no pictures], just furniture. And I said [to Angala], "You're welcome to use this office."

Butler "didn't realize it was [plaintiff's] office"; he assumed this "empty" office was unassigned. Breneman, in turn, was hundreds of miles away, so he was unaware of what had happened, and could not correct the mistake.

When plaintiff returned from vacation, he discovered what had happened. He did *not* ask to see Butler to correct this mix-up. He left and went home, then complained to Human Resources. In early Oct., Butler learned about the mistake from Human Resources. This was the first time anyone told him that plaintiff was supposed to have an office. Butler replied, "I'd be more than happy to give him an office, have him call me so we can work it out." Human Resources relayed that message to plaintiff:

> Pete Butler would like to discuss office options with you. . . . Please contact him at your earliest convenience to set up a meeting.

[Def. mot.] (Exh. 28) (Oct. 7, 2002 e-mail). Despite receiving this message, plaintiff didn't bother to call Butler. In fact, he "**never** asked" Butler to find him a private office, not even when they met face-to-face in December. That is how he wound up with a cubicle, instead of an enclosed office.

Def. mot. at 23-24 (other citations omitted). Pikus does not deny the details of Metropolitan's account. In particular, he does not deny that Butler told Pikus through Human Resources to contact him about office options and that Pikus did not do so.

Metropolitan also contends that Butler did not ignore Pikus and gives the following explanation for the delay in their meeting after Butler became Managing Director. It supports

its account with citations to Pikus depo. and the affidavit of Butler ("Butler aff.") attached to

Def. mot.:

>         When Butler arrived, in Sept. 2002, he set up a schedule to meet one-on-one
> with each of the agency's sales reps.  Plaintiff's name was omitted from a list of
> meetings scheduled to take place at the agency, because Butler wanted to meet with
> him more privately, at another location.  Butler's assistant called plaintiff and tried to
> schedule a meeting near his home.  But one time Butler had to postpone it, the new
> times he proposed were not convenient for plaintiff, then plaintiff went on vacation for
> a couple of weeks, etc.
>         After one month Human Resources assured plaintiff that Butler still wanted to
> meet, then urged him to call Butler.  The ball was back in plaintiff's court, but despite
> this invitation, <u>plaintiff</u> decided *not* to call Butler.  After hearing nothing from plaintiff for
> two months, Butler re-took the initiative.  They finally met in December.
>         Plaintiff is not the only sales rep whose 1-on-1 meeting with Butler was delayed.
> Despite his good intentions, his busy schedule delayed his meetings with several sales
> reps, including some of the agency's top producers.  For example, **Tom Kehoe** won
> the agency's "Agent of the Year" award in 2002.  Butler didn't meet Keho until the
> awards ceremony, at year-end.  **Lisa Grassbaugh** is another top producer at the
> agency.  Butler was unable to meet with her until 2003, <u>after</u> he met with plaintiff.  In
> each case, meetings were arranged but then postponed, due to busy schedules.

Def. mot. at 22 (emphases in the original).  Pikus does not deny the details of Metropolitan's

account.  In particular, Pikus does not deny that he was invited to call Butler and failed to do

so.

Assuming *arguendo* that Pikus' loss of his office and Butler's failure to meet with him

were sufficiently intolerable that a reasonable person would have felt compelled to resign,

Pikus cannot allege constructive discharge due to intolerable conditions if he refused to avail

himself of reasonable remedies offered to him to alleviate those conditions.  Metropolitan's

actions alone did not make working conditions intolerable; Pikus' failure to take reasonable

measures to solve his own problems were, at least, a contributing factor to his difficult working

conditions.  For this reason the magistrate judge recommends that the court grant

22

Metropolitan's motion for summary judgment as regards Pikus' cause of action for age discrimination based on allegations of constructive discharge.

IV.  Cause of action for breach of implied contract

Pikus argues that Metropolitan's conduct toward him created an implied contract whereby he believed that he was no longer removable at will from his position as Managing Director of his agency.  Pikus variously asserts that the implied contract provided that he "could only be removed from the Managing Director position for cause," Pikus aff. at 11, and that the implied contract provided that he could "continue on as an employee with Defendant indefinitely," Amended complaint (Docket #44), p. 9.  Metropolitan denies that its treatment of Pikus created an implied contract removing Pikus from terminable-at-will employment.

Ohio law provides that an employee who is hired for an indefinite period of time is an employee at will.  *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 483 N.E.2d 150 (1985); *Henkel v. Educational Research Council of Am.*, 45 Ohio St. 2d 249, 344 N.E.2d 118 (1976).  In such an employment relationship either the employer or the employee may terminate the relationship at any time for any reason not contrary to law.  *Mers*, 19 Ohio St. 3d at 101, 483 N.E.2d at 151;  *Henkel*, 45 Ohio St. 2d at 255, 344 N.E.2d at 122.  Ohio law presumes that employment is at-will unless circumstances indicate that employment is for a specific term.  *Henkel*, 45 Ohio St. 2d at 256, 344 N.E.2d at 122. Ohio courts have found two exceptions, however, to the presumption in favor of terminable-at-will employment:  "(1) the existence of implied or express contractual provisions which alter the terms of discharge; and (2) the existence of promissory estoppel where representations or promises have been made

23

to an employee." *Wright v. Honda of Am.*, 73 Ohio St. 3d 571, 574, 653 N.E.2d 381, 384 (1995).

Pikus alleges that an implied contract between him and Metropolitan has removed him from terminable-at-will employment. When an employee contends that an employer's conduct toward him has created an implied contract of continued employment between the parties, the employee "must prove the existence of each element necessary to the formation of a contract." *Daup v. Tower Cellular, Inc.*, 136 Ohio App. 3d 555, 561, 737 N.E.2d 128, 133 (2000) (quoting *Penwell v. Amherst Hosp.*, 84 Ohio App. 3d 16, 21, 616 N.E.2d 254, 257-258 (1992)); *see also Stepp v. Freeman*, 119 Ohio App. 3d 68, 74, 694 N.E.2d 510, 514 (1997); *Rudy v. Loral Defense Sys.*, 85 Ohio App. 3d 148, 152, 619 N.E.2d 449, 452 (1993); *Sancap Abrasives Corp. v. Swiss Indus. Abrasives Grp.*, 68 F. Supp. 2d 853, 862 (1999). Under Ohio law, a plaintiff seeking to establish the existence of a contract "must show the elements of mutual assent (generally, offer and acceptance) and consideration[,] . . . a 'meeting of the minds' and that the contract was definite as to its essential terms." *Nilavar v. Osborn*, 127 Ohio App. 3d 1, 11, 711 N.E.2d 726, 732 (1998) (citations omitted); *see also McSweeney v. Jackson*, 117 Ohio App. 3d 623, 631, 691 N.E.2d 303, 308 (1996) ("In order to declare the existence of a contract, the parties to the contract must consent to its terms, there must be a meeting of the minds of both parties, and the contract must be definite and certain."). In general, "[a]n agreement is enforceable if it encompasses the essential elements of the bargain." *Mr. Mark Corp. v. Rush*, 11 Ohio App. 3d 167, 169, 464 N.E.2d 586, 589 (1983). In the case of implied contracts of employment and questions of whether employment

24

is at-will, "the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question, can be considered by the trier of fact in order to determine the agreement's explicit and implicit terms concerning discharge." *Mers*, 19 Ohio St. 3d at 103, 483 N.E.2d at 154.  The plaintiff "must demonstrate that the circumstances surrounding the parties' transaction make it reasonably certain that an agreement was intended."  *Stepp*, 119 Ohio App. 3d at 74, 694 N.E.2d at 514.

In the instant case Pikus does little to establish the existence of an implied contract of employment.  In Pl. opp. Pikus first argues incorrectly that Ohio law permits a trier of fact to infer into at-will employment relationships "an implied 'just cause' requirement and to second guess an employer's business judgment in any case, based on factors so amorphous as 'the character of the employment, custom, the course of dealing between the parties, company policy, or *any other facts which may illuminate the question*."  Pl. opp. at 35 (citing Bradd N. Siegel and John M. Stephen, "Judicial Erosion of Employment at Will in Ohio," Porter, Wright, Morris & Arthur, LLP, Ohio Employment Practices Law, §4.2 (West Group 2001) (emphasis in quoted source).[11]  Pikus then argues:

> Here, the trier of fact could second guess the Defendant's business judgment based on the oral representations that senior officials of Defendant made to Plaintiff combined with Defendant's different treatment of Plaintiff as compared with other [Managing Directors].
>
> 59.    The Company routinely referred to me as their partner.
>
> 60.    I was regularly told by Steve Day, Mike Vietri, and other senior officers

---

[11]  Pikus cites no Ohio case or statute for this proposition other than the citations to *Mers* in the quoted source.  As already described, this is not an accurate statement of Ohio law on the issue.

25

of the Company that I was taking ownership in the business, and that I needed to invest in the business.

61.     I relied on the Company's representations in the previous two paragraphs and believed that I could only be removed from the Managing Director position for cause.

62.     I was never asked by anyone at the Company to sign a letter outlining the terms and conditions of my employment, as was [sic] Bugler [sic] and Long. Copies of the employment letters that the Company required Managing Directors Butler and Long to sign were introduced into evidence at the evidentiary hearing on my Motion to Remand, and are again attached hereto as **Exhibits I-1** and **I-2** respectively.

Pikus Aff. ¶¶ 59-62.

It is significant that Defendant did not follow its own professed policy when it came to Plaintiff of requiring [Managing Directors] to sign an offer letter that contained an at-will disclaimer, MSJ, 29-30, because Plaintiff's employment was not terminable at-will.

Pl. opp. at 36 (emphasis in original).

Pikus does not describe the terms of the implied contract he alleges with sufficient specificity to allow a court to enforce that contract.[12]  First, as already noted, although Pikus claims in his affidavit that the contract provides that his employment was terminable "for cause," his Complaint claims that he could "continue on as an employee with Defendant indefinitely."  Amended complaint at 9.  Second, if the implied contract provides that Pikus is terminable for cause, then Pikus must say *something* about what constitutes cause sufficient to allow termination of the employment relationship.  Pikus is absolutely silent on this subject.  That silence alone is fatal to Pikus' allegation of an implied contract, given Metropolitan's

---

[12]  Pikus also does not seem to notice that a "partner" or an "investor" is not necessarily an employee.  One may be a partner or an investor in an enterprise without being employed by that enterprise.

insistence that Pikus was removed from the position of Managing Director for cause. A court cannot enforce a contreact providing for termination "for cause" unless it has some guidance as to what constitutes cause for termination. Pikus might have referred to policy or custom at Metropolitan or to general industry practice in arguing what constitutes cause sufficient for termination. Instead, he says nothing. That failure to speak presents the court with an alleged contract impossible of enforcement. Ohio law will not allow a court to find an implied contract under those circumstances. For this reason the magistrate judge recommends that the court grant Metropolitan's motion for summary judgment as regards Pikus' cause of action for breach of implied contract.

III.

For the reasons given above the magistrate judge recommends that the court grant Metropolitan's motion for summary judgment and dismiss Pikus' complaint with prejudice.[13]

Date:  June 16, 2005                    /s/Patricia A. Hemann
                                        Patricia A. Hemann
                                        United States Magistrate Judge

**OBJECTIONS**

---

[13]  Pikus mistakenly asserts that a document which Metropolitan produced during his deposition as a copy of his May 1996 self-assessment form and which turned out not to be that document was a "falsified record" which precludes summary judgment in favor of Metropolitan. *See* Pl. opp. at 7; *see also* Metropolitan's explanation at Reply at 17-18. Pikus is mistaken. The document in question has no relevance to Metropolitan's motion for summary judgment, and Pikus does not allege that any of the documents upon which Metropolitan does rely its the brief in support of its motion were in any way unreliable. Pikus cites no law in support of the proposition that an issue as to the validity of a document in the record not relevant to a pending motion for summary judgment prevents a court from granting that motion.

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).